**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| **WRAPCITY OUTDOOR, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 23-cv-12680-DJC** |
| | ) | |
| **ICON MEDIA, INC., JAMES DIZAZZO,** | ) | |
| **and BIG OUTDOOR OPCO, LLC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**MEMORANDUM AND ORDER**</u>

**CASPER, J.**                                                         **February 8, 2024**

## I.      Introduction

WrapCity Outdoor, LLC ("Wrapcity") filed this lawsuit against Defendants Icon Media, Inc. ("Icon"), James DiZazzo ("DiZazzo") and Big Outdoor OPCO, LLC ("BIG") (collectively, "Defendants"), seeking declaratory judgment and alleging unfair and deceptive trade practices under Mass. Gen. L. c. 93A, breach of contract as to Icon and DiZazzo, unjust enrichment as to Icon and BIG, and tortious interference with advantageous business relations as to Defendants. D. 1. BIG filed counterclaims against Wrapcity, seeking declaratory judgment and alleging breach of contract and unfair and deceptive trade practices under Mass. Gen. L. c. 93A; BIG also filed crossclaims against Icon and DiZazzo, alleging breach of contract as to Icon and negligent misrepresentation as to Icon and DiZazzo. D. 12. BIG has moved for preliminary injunction seeking to enjoin Wrapcity from disavowing BIG's 2017 agreements with Icon, whom it alleges

is the authorized agent of Wrapcity.  D. 13.  For the reasons stated below, the Court DENIES the motion.

## II.    Standard of Review

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the [movant] is entitled to such relief."  Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008) (citing Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (per curiam)).  In deciding whether to grant a preliminary injunction, the Court must assess "(1) the [movant]'s likelihood of success on the merits; (2) the potential for irreparable harm in the absence of an injunction; (3) whether issuing an injunction will burden [the nonmovant] less than denying an injunction would burden [the movant]; and (4) the effect, if any, on the public interest."  González-Droz v. González-Colon, 573 F.3d 75, 79 (1st Cir. 2009) (quoting Bos. Duck Tours, LP v. Super Duck Tours, LLC, 531 F.3d 1, 11 (1st Cir. 2008)).

The burden of providing a factual basis sufficient to justify a preliminary injunction rests with the party seeking the injunction.  Nieves-Márquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2003).  The Court may accept uncontroverted affidavits as true; however, when "courts are faced with affidavits at odds and must make a credibility determination between them, courts generally do not issue a preliminary injunction, but rather leave the issue for a jury to resolve."  Rohm & Haas Elec. Materials, LLC v. Elec. Circuits, 759 F. Supp. 2d 110, 114 n.2, 125 n.107 (D. Mass. 2010); see Spencer Cos., Inc. v. Armonk Indus., Inc., 489 F.2d 704, 707 (1st Cir. 1973) (affirming the refusal to grant a preliminary injunction as an appropriate exercise of discretion where there was a "major factual dispute" and "uncertainty whether [the movant] would ever prevail on the merits").

### III.     Factual Background

BIG is a media company that provides outdoor advertisement services.  D. 15 ¶ 2.  Its clients include Apple, Google, Amazon and other large companies.  Id.; see D. 22 ¶ 27.  In 2013, BIG entered into an advertising agreement with Icon to place ads on a billboard at 363 Albany Street overlooking Interstate 93 (the "I-93 Billboard").[1]  D. 15 ¶ 3; D. 22 ¶ 40.  The initial term of the contract was from June 1, 2013 to December 31, 2013.  D. 15 ¶ 4; D. 22 ¶ 40.  BIG retained a right of first refusal to renew the contract but instead of renewing the contract at the term's end, BIG and Icon entered into yearly contracts from 2014 to 2016 (the "Original Contract").  D. 15 ¶ 4.  Business dealings concerning the Original Contract were conducted between BIG representatives and DiZazzo, the founder of Icon.  Id. ¶ 14; see D. 17 ¶ 2; D. 22 ¶ 40.

In 2016, BIG and DiZazzo began discussing the prospect of entering a new agreement to replace their yearly renewal process.  D. 15 ¶ 10.  To that end, on or about January 1, 2017, BIG and Icon entered into a new contract in connection with the I-93 Billboard (the "I-93 Agreement").  Id. ¶ 11; see D. 15-2.  Around the same time, BIG and Icon entered into an agreement for another advertisement space, i.e., a wallscape located at 22-40 Kneeland Street, Boston, Massachusetts (the "Theater District Wallscape") (the "Theater District Agreement," collectively, with the "I-93 Agreement," the "2017 Agreements").  D. 15 ¶ 12; see D. 15-3; D. 22 ¶ 42.  Pursuant to the 2017 Agreements, Icon appointed BIG to serve as the exclusive national sales representative for the I-93 Billboard and the Theater District Wallscape.  D. 15 ¶ 13.

Under the terms of the 2017 Agreements, Icon presented itself as the operator of the advertising locations for the I-93 Billboard and the Theater District Wallscape.  Id. ¶ 15.  For

---

[1] Icon initially entered into the 2013 agreement with a company called "Big Media," which BIG acquired in 2013.  D. 15 ¶ 3.

instance, the I-93 Agreement provides, in relevant part, "pursuant to a lease or other agreement . . . by and between Icon and the applicable property owner, Icon operates an outdoor advertising location . . . at a location described as Boston I-93 North/South in Boston, Massachusetts," i.e., the I-93 Billboard.  D. 15-2 at 1.  The Theater District Agreement provides, in relevant part, that "pursuant to a lease, license or other agreement . . . by and between Icon and the applicable property owner, Icon operates an outdoor advertising location . . . at a location described as Theatre District West Wall, WF in Boston, Massachusetts," i.e., the Theater District Wallscape.  D. 15-3 at 1.  The 2017 Agreements further provide that "Icon represents and warrants that the appointment of [BIG] pursuant to this Agreement is not a violation or breach of the Lease, including any prohibition on assignment or subletting thereunder."  D. 15-2 at 1; D. 15-3 at 1; <u>see</u> D. 22 ¶ 42.  The 2017 Agreements states, in relevant part, that "[t]he person signing this Agreement, on behalf of the respective party represents and warrants that he/she has full authority to do so."  D. 15-2 at 4; D. 15-3 at 4.

On or about May 2, 2023, BIG and Icon entered into the first amendment to the I-93 Agreement (the "2023 Amendment"), in part, to facilitate the installation of a new digital billboard to replace the I-93 Billboard (the "Conversion").  D. 15 ¶ 21; D. 15-2 at 10–15.  The 2023 Amendment provides, in relevant part, that "Icon represents and warrants that the Conversion is not and shall not be a violation or breach of the Lease, and Icon has obtained all necessary consents and any other permissions required under the Lease to undertake the Conversion."  D. 15-2 at 10. Section 6(e) of the Amendment further provides, "Each party represents and warrants that all approvals, if any, that may be required by third parties to amend the Agreement, including lenders and any third party that is party to the Lease, if any, have been obtained."  <u>Id.</u> at 12.  According to Eric Niemeyer, BIG's co-founder, "[t]he initial term of the Digital Agreement, as amended, is from

January 1, 2017 to June 14, 2028, with an additional option granted to BIG to extend the term an additional five (5) years."  D. 15 ¶ 24; see D. 15-2 at 11; D. 17 ¶ 8.  In or around June 2023, the Conversion went into effect, and the I-93 Billboard was transformed into a digital sign.  D. 15 ¶ 25.  Following the Conversion, Apple declined to continue advertising on the digital sign, resulting in a decline in revenues from the I-93 Billboard.  Id. ¶¶ 25–26; D. 22 ¶¶ 40–41.

Meanwhile, as BIG alleges, tensions arose between DiZazzo and his brother-in-law Greg John, the owner and founder of Wrapcity, over BIG's advertising rights to the I-93 Billboard.  See D. 15 ¶ 31; D. 16 ¶ 3; D. 17 ¶¶ 3, 9; D. 22 ¶¶ 1–2, 40–41, 55, 61–67.  As discussed further below, however, the nature of the working relationship between the two men and their companies is the subject of intense disagreement among the parties.  See D. 15 ¶ 32; D. 16 ¶ 4; see, e.g., D. 17 ¶ 3 (DiZazzo attesting that "[i]n 2009, Icon entered a partnership with WrapCity LLC ('WrapCity') to pursue outdoor advertising opportunities in Boston, Massachusetts"); D. 22 ¶ 3 (John attesting that same "is demonstrably false" and that "Icon could not have been a partner in Wrapcity in 2009 as Wrapcity did not exist until December 2011").  In the midst of the dispute between DiZazzo and John, John and Wrapcity entered into discussions with BIG concerning the advertising rights to the I-93 Billboard.  See D. 16 ¶ 5; D. 22 ¶¶ 52, 56–58.

On October 23, 2023, Wrapcity's counsel sent a letter to BIG informing BIG that Wrapcity and John had demanded that Icon and DiZazzo cease and desist from all contact with BIG concerning the 2017 Agreements, from collecting revenue from BIG under the 2017 Agreements, as well as from representing themselves as sales agents or owners of Wrapcity to third parties.  D. 14 ¶ 3; see D. 14-1.  On Tuesday, November 14, 2023, an executive at one of BIG's competitors, New Tradition Media ("New Tradition"), called BIG's President, Bill Tagliaferri, to inform him that New Tradition had been awarded the rights to the I-93 Billboard.  D. 16 ¶¶ 7–8.

The next day, on November 15, 2023, Wrapcity's counsel sent a letter to Icon's counsel and copied BIG's counsel, demanding that Icon provide termination notice of the I-93 Agreement to BIG pursuant to Section 2 of that agreement.  D. 14 ¶ 4; see D. 14-2.

## IV.    Procedural History

On November 7, 2023, Wrapcity filed a complaint against Defendants Icon, DiZazzo and BIG.  D. 1.  BIG answered on November 30, 2023, asserting counterclaims against Wrapcity, D. 12 at 18–21 ¶¶ 45–67, and crossclaims against Icon and DiZazzo.  Id. at 21–22 ¶¶ 68–78.  BIG also moved for a preliminary injunction enjoining Wrapcity from contracting with any entity concerning the right to operate and access the I-93 Billboard and the Theater District Wallscape. D. 13; D. 13-1 at 3.  On January 17, 2024, the Court heard the parties on the pending motion and took the matter under advisement.  D. 40.

## V.    Discussion

### A.    Likelihood of Success on the Merits

Although the Court considers all factors of the preliminary injunction analysis, "[t]he sine qua non of this four-part inquiry is likelihood of success on the merits:  if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002); see Boathouse Grp., Inc. v. TigerLogic Corp., 777 F. Supp. 2d 243, 248 (D. Mass. 2011).  Where the factual record is contested, particularly as to the key consideration of likelihood of success on the merits, a preliminary injunction may not be proper.  See Spencer Co., 489 F.2d at 707; Guevara-Salgado v. Hayes-Meninno, LLC, No. 15-12294-PBS, 2016 WL 3774195, at *1 (D. Mass. Feb. 5, 2016) (denying preliminary injunction where the facts pertaining to substantial likelihood of success were "hotly dispute[d]").

BIG raises three counterclaims against Wrapcity:  declaratory judgment, breach of contract and an alleged violation of Mass. Gen. L. c. 93A, § 11.   D. 12 at 18–21 ¶¶ 45–67.  The only contracts involving BIG's declaratory judgment and breach of contract counterclaims are the 2017 Agreements, to which Icon and BIG (not Wrapcity) were parties.  Id. at 18–20 ¶¶ 45–61.  For BIG to prevail against Wrapcity on such claims, it is on the theory, as alleged, that Icon and DiZazzo were the authorized agents of Wrapcity, which is the core of the parties' dispute.  Accordingly, BIG's counterclaims rise and fall on the threshold question of whether Icon was authorized to bind Wrapcity to the 2017 Agreements and the 2023 Amendment to the I-93 Agreement.

"Authority is 'the power of the agent to affect the legal relations of the principal by acts done in accordance with the principal's manifestations of consent to him.'"  Haufler v. Zotos, 446 Mass. 489, 497–98 (2006) (quoting Restatement (Second) of Agency § 7 (1958)).  "An agency relationship is created when there is mutual consent, express or implied, that the agent is to act on behalf and for the benefit of the principal, and subject to the principal's control."  Theos & Sons, Inc. v. Mack Trucks, Inc., 431 Mass. 736, 742 (2000); see T.D. Downing Co. v. Shawmut Corp., 245 Mass. 106, 113 (1923) (recognizing that the "relation of principal and agent may arise wholly by implication from the conduct of the parties and the circumstances of the particular case").  "Implied authority may also arise from a principal's course of conduct that demonstrates acquiescence in similar acts by the agent."  Lowell Hous. Auth. v. PSC Int'l, Inc., 692 F. Supp. 2d 180, 190–91 (D. Mass. 2010).

"[E]ven where an agent lacks actual authority," a principal may ratify the acts of an agent "if the princip[al] acquiesces in the agent's action, or fails promptly to disavow the unauthorized conduct after disclosure of material facts."  Grishman v. Clark, No. 22-11009-RGS, 2023 WL 3742814, at *7 (D. Mass. May 31, 2023) (quoting Linkage Corp. v. Trs. of Bos. Univ., 425 Mass.

1, 18 (1997)).  "If a principal retains a benefit resulting from an unauthorized act of an agent 'for a considerable time after he obtains full knowledge of the transaction, he thereby ratifies the act.'" Kidder v. Greenman, 283 Mass. 601, 616 (1933) (quoting Brown v. Henry, 172 Mass. 559, 568 (1899)).

BIG asserts that Icon was authorized to enter the 2017 Agreements and the 2023 Amendment and to bind Wrapcity to same.  D. 18 at 12.  Specifically, BIG points to allegations in Wrapcity's complaint noting that "[a]s an agent of Wrapcity, Icon through Dizazzo, owed a fiduciary duty to Wrapcity," D. 1 ¶ 61, that "Icon entered into a verbal agency agreement with Wrapcity to act as its agent to procure advertising for the Billboard," id. ¶ 72, and that Wrapcity knew of and approved BIG's placement of Apple advertisements on the I-93 Billboard, id. ¶¶ 29–30.  BIG also points to an affidavit by DiZazzo, in which he attests that Wrapcity was aware of the relationship between Icon and BIG.  See D. 17 ¶ 5.  Moreover, BIG's co-founder Eric Niemeyer attests that at no point before Fall 2023 did Wrapcity indicate that DiZazzo or Icon were not authorized to represent Wrapcity.  D. 15 ¶ 30.

Wrapcity disputes BIG's suggestion that it authorized Icon to enter the 2017 Agreements and the 2023 Amendment.  D. 21 at 9–12.  Of note, Wrapcity proffers a "Sales Representative Agreement," between Wrapcity and Icon, which purportedly reflects the scope of Icon's authorization.  D. 22 ¶¶ 20–21, 27–29; see D. 22-4.  According to the terms of the Sales Representative Agreement, Wrapcity retained "the right to reject any contract between Customer and IPSM for any reason which, in the sole judgment of Wrapcity, is reasonable grounds for refusal, including without limitation, an objection by Wrapcity's lessor."[2]  D. 22-4 at 1.  Section

---

[2] John asserts that the parties subsequently agreed to substitute Icon for "IPSM," D. 22 ¶ 29, Icon's predecessor company.  D. 17 ¶ 2.

6.1 of the Sales Representative Agreement further provides that "[n]either party to this Agreement . . . shall . . . have any authority to make any agreement or commitment for the other party or to incur liability or obligation in the other party's name or on its behalf" and that "[n]othing contained in this Agreement shall be construed or interpreted as creating an agency, partnership or joint venture relationship between the parties." D. 22-4 at 5. John also disclaims any knowledge of the 2017 Agreements. D. 22 ¶ 40. According to his affidavit, DiZazzo only ever sent Wrapcity an unsigned version of the Original Contract, and he "never received another proposed contract from Mr. DiZazzo for Apple advertising at any time through that 10-year period." Id. John maintains that DiZazzo "told [him] that Apple was simply renewing or extending the contract" each year. Id. John also disclaims any knowledge of the 2023 Amendment, noting that he was "[u]naware that Mr. DiZazzo was planning to sign the Amendment to the Representation Agreement with Big," id. ¶ 51; see id. ¶¶ 54–55, and that it was not until October 2, 2023 that he would see a copy of the 2023 Amendment. Id. ¶ 61.

What is clear at this early juncture is that the parties "hotly dispute" the factual record as to whether Wrapcity authorized Icon to enter into the 2017 Agreements and the 2023 Amendment on its behalf. See Guevara-Salgado, 2016 WL 3774195, at *1. The complaint's allegations cited by BIG do not offer much, if any, color as to the specifics of the relationship between Icon and Wrapcity. Put differently, Icon's authority to represent Wrapcity under the Original Contract does not translate into express or implied authority to bind Wrapcity to the 2017 Agreements or the 2023 Agreement. At a minimum, the Sales Representative Agreement and John's affidavit undermine DiZazzo's suggestion that he kept Wrapcity apprised of the contract, highlight the gravity of the factual disputes and counsel in favor of leaving the matter to the factfinder after

discovery.  See Rohm & Haas Elec. Materials, 759 F. Supp. 2d at 125 n.107; Am. Century Home Fabrics, Inc. v. Ashley Furniture Indus., Inc., 473 F. Supp. 2d 168, 175 (D. Mass. 2007).

BIG also presses the theory that Wrapcity was bound to the 2017 Agreements because it ratified Icon's authority to enter the agreements by virtue of receiving revenues pursuant to these contracts for five years leading up to May 2023.  D. 18 at 13–14.  Wrapcity, however, has supplied another, unrelated reason explaining why it would have expected revenues during that time, namely that Apple had continued advertising on the I-93 Billboard uninterrupted.  D. 22 ¶ 40 (John attesting that "[f]rom June 2013 through May 2023 . . . Apple was the only advertiser on the [I-93 Billboard]" and that during that time DiZazzo had "informed [John] annually that Apple was 're-upping' the [Original Contract] for a period of one year").  Moreover, as already noted, John disclaims any knowledge of the 2017 Agreements and the 2023 Amendment.  See id. ¶¶ 51, 54–55.  Given the dispute as to whether John or Wrapcity had "full knowledge" of the 2017 Agreements, as well as the 2023 Amendment, the Court cannot determine at this stage of the litigation whether Wrapcity ratified the relevant agreements.[3]  See Kidder, 283 Mass. at 616.

As BIG itself acknowledges, its "claims and defenses depend on a finding that Wrapcity is bound to the 2017 Agreements via Icon."  D. 18 at 9.  The Court cannot make that finding on the present, disputed record.  Thus, BIG has not demonstrated a likelihood of success as to its

---

[3] In its reply, D. 29 at 8–9, BIG asks the Court to impute Icon's knowledge of the 2017 Agreements to Wrapcity, reasoning that even a "rogue agent" may bind a principal "if the agent enters into negotiations within the scope of his powers and the person with who he deals reasonably believes him to be authorized to conduct the transaction."  Id. at 8 (quoting Restatement (Second) of Agency § 282(2)(b)).  The scope of Icon and DiZazzo's powers, however, has not been established.  While BIG asserts that Icon and DiZazzo had the authority to bind Wrapcity to the 2017 Agreements and the 2023 Amendment, citing affidavits, D. 18 at 9–13, Wrapcity avers that the scope of Icon's authority was limited to past, annual renewals of the Original Contract with Apple and points to John's affidavit and the Sales Representative Agreement supporting same.  D. 21 at 9–12.

counterclaims for declaratory judgment and breach of contract or the Mass. Gen. L. c. 93A claim, which, as alleged, rests on the contract claim.  See D. 12 at 20 ¶ 65 (alleging that Wrapcity's decision to file a lawsuit against BIG "is deceptive because it is acting in bad faith by fabricating a basis to disavow the 2017 Agreements to BIG's detriment"); D. 18 at 16 (arguing that "Wrapcity's reneging on the 2017 Agreements between BIG and Icon for the I-93 Billboard and Theater District Wallscape constitute unfair and deceptive trade practices").

### B.   Irreparable Harm

To obtain injunctive relief, a plaintiff must also show a "significant risk of irreparable harm if the injunction is withheld," Equal Emp. Opportunity Comm'n v. Astra USA, Inc., 94 F.3d 738, 742 (1st Cir. 1996), that "cannot adequately be remedied through money damages alone." Corp. Techs., Inc. v. Harnett, 943 F. Supp. 2d 233, 242 (D. Mass.), aff'd, 731 F.3d 6 (1st Cir. 2013). BIG "need not demonstrate that the denial of injunctive relief will be fatal to its business," as long as it can demonstrate a "substantial injury that is not accurately measurable or adequately compensable by money damages." Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 18–19 (1st Cir. 1996).  To analyze whether BIG has made this showing, the Court considers certain "guideposts," such as whether its showing "possess[es] some substance" and is not "tenuous or overly speculative" and weighs the predicted harm "in tandem" with likelihood of success.  Id. at 19.

BIG insists that, without a preliminary injunction, it will suffer irreparable harm in the form of customer defections and damage to its reputation.  D. 18 at 17–19.  According to Tagliaferri, one of BIG's customers contacted BIG on November 20, 2023, writing, "I just got an email from [New Tradition] that they're taking over the Boston screen we have approval on for [BIG's customer's client].  Can you confirm if we should still be running through Big, or if we should

loop them in?"  D. 16 ¶ 12.  Siegal also attests that, on November 30, 2023, BIG's sales team received an email from one of its advertising clients stating, "We talked with New Tradition and they said that Boston D120 [the I-93 Billboard] is moving to them.  Are you aligned with me removing this from your contract and putting it under their name?"  D. 14 ¶ 7.  In its reply to Wrapcity's opposition, BIG identifies additional examples of customer defections.  See D. 29 at 2–3.  For instance, according to an affidavit by BIG's Chief Revenue Officer Ian Rappaport, one of BIG's advertising clients contacted the company on December 1, 2023 stating, "We received the documentation from New Tradition that [the I-93 Billboard] is now being repped by them. We'll be sending [you] the revised contract cancelling the 12/4-12/31 portion of the buy."  D. 29-4 ¶ 10.

To the extent BIG's lost customer contracts reflect "economic damages," these harms do not rise to the level of being irreparable.  See Vaquería Tres Monjitas, Inc. v. Irizarry, 587 F.3d 464, 485 (1st Cir. 2009) (citing P.R. Hosp. Supply, Inc. v. Bos. Sci. Corp., 426 F.3d 503, 507 (1st Cir. 2005)).  At the same time, the Court does not underestimate that, given the purportedly small size of the market, see D. 18 at 18, the loss of customer contracts may result in harms to BIG that are not readily calculable, such as the impact on BIG's goodwill with customers and its overall standing in the market, see D. 16 ¶¶ 13–15, and to the extent the I-93 Billboard and the Theater District Wallscape are in unique locations.  See id. ¶¶ 16–18.  Nonetheless, here, there is a disputed record as to whether Wrapcity is bound by the 2017 Agreements, any risk of harm does not remedy the lack of reasonable likelihood of success.  See Ross-Simons of Warwick, Inc., 102 F.3d at 19.

### C.  **Balance of Hardships**

"Any potential harm caused to [BIG] by a denial of its motion must be balanced against any reciprocal harm caused to [Wrapcity] by the imposition of an injunction."  TouchPoint Sols.,

Inc. v. Eastman Kodak Co., 345 F. Supp. 2d 23, 32 (D. Mass. 2004). "The potential of lost profits alone does not constitute sufficient hardship for this inquiry." Dunkin' Donuts Franchised Restaurants LLC v. Wometco Donas Inc., 53 F. Supp. 3d 221, 232 (D. Mass. 2014) (citing Concrete Machinery Co., Inc. v. Classic Lawn Ornaments, Inc., 843 F.2d 600, 612 (1st Cir. 1988)). Notwithstanding the hardships already discussed as to BIG, the issuance of a preliminary injunction would also impose significant hardships upon Wrapcity, binding it to a contract between other entities without an adequate showing of authorization or ratification. See D. 15-2 at 11. The balance of hardships, therefore, does not weigh in BIG's favor.

### D. Public Interest

A preliminary injunction is not appropriate unless there is "a fit (or lack of friction) between the injunction and the public interest." Nieves-Márquez, 353 F.3d at 120. "The public interest that is referred to in the test [is] the public's interest in the issuance of the injunction itself." Braintree Labs., Inc. v. Citigroup Global Mkts. Inc., 622 F.3d 36, 45 n.8 (1st Cir. 2010) (emphasis omitted); see Ross-Simons of Warwick, Inc., 102 F.3d at 15 (reviewing "the effect (if any) of the court's ruling on the public interest"). The public interest is served by ensuring a company is not bound by the actions of another where a sufficient showing has not been made that the other company was authorized to do so.

## VI.   Conclusion

Having considered all of the factors above and for the reasons stated, the Court DENIES BIG's motion for injunctive relief. D. 13.

So Ordered.

/s Denise J. Casper
United States District Judge