UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| WRAPCITY OUTDOOR, LLC,<br><br>Plaintiff,<br><br>v.<br><br>ICON MEDIA, INC., JAMES DIZAZZO,<br>and BIG OUTDOOR OPCO, LLC,<br><br>Defendants. | Case No. 23-cv-12680-DJC |

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                                                       **June 10, 2024**

## I.   Introduction

WrapCity Outdoor, LLC ("Wrapcity") filed this lawsuit against Defendants Icon Media, Inc. ("Icon"), James DiZazzo ("DiZazzo") and Big Outdoor OPCO, LLC ("BIG") (collectively, "Defendants"), alleging unfair and deceptive trade practices under Mass. Gen. L. c. 93A ("Chapter 93A") (Count I), seeking declaratory judgment (Count II), and also alleging breach of contract as to Icon and DiZazzo (Count III), unjust enrichment as to Icon and BIG (Count IV) and tortious interference with advantageous business relations as to Defendants (Count V).  D. 1.  Icon and DiZazzo have moved for judgment on the pleadings on all counts asserted by Wrapcity.  D. 31. For the reasons stated below, the Court DENIES the motion.

## II.  Standard of Review

Rule 12(c) allows a party to move for judgment on the pleadings at any time "[a]fter the pleadings are closed—but early enough not to delay trial."  Fed. R. Civ. P. 12(c).  A motion for

judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) is "ordinarily accorded much the same treatment" as a Rule 12(b)(6) motion.  Aponte-Torres v. Univ. of P.R., 445 F.3d 50, 54 (1st Cir. 2006).  To survive a motion for judgment on the pleadings, therefore, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  Because a motion for judgment on the pleadings "calls for an assessment of the merits of the case at an embryonic stage," the Court "view[s] the facts contained in the pleadings in the light most favorable to the nonmovant and draw[s] all reasonable inferences therefrom" in his favor.  Pérez-Acevedo v. Rivero-Cubano, 520 F.3d 26, 29 (1st Cir. 2008) (internal citation and quotation marks omitted).

On a Rule 12(c) motion, unlike a Rule 12(b) motion, the Court considers the pleadings as a whole, including the answer.  See Aponte-Torres, 445 F.3d at 54–55.  Those assertions in the answer that have not been denied and do not conflict with the assertions in the complaint are taken as true.  See Santiago v. Bloise, 741 F. Supp. 2d 357, 360 (D. Mass. 2010).  In addition, "[t]he court may supplement the facts contained in the pleadings by considering documents fairly incorporated therein and facts susceptible to judicial notice."  R.G. Fin. Corp. v. Vergara-Nuñez, 446 F.3d 178, 182 (1st Cir. 2006).  Still, "[l]ike Rule 12(b)(6), Rule 12(c) does not allow for any resolution of contested facts; rather, a court may enter judgment on the pleadings only if the uncontested and properly considered facts conclusively establish the movant's entitlement to a favorable judgment."  Aponte-Torres, 445 F.3d at 54.

III.   **Factual Background**

Unless otherwise indicated, the following summary is based on the allegations in complaint, D. 1, and the undisputed facts in Icon and DiZazzo's answer.[1] D. 30.

On November 5, 2012, Wrapcity entered into a written lease agreement with the owner of a building at 363 Albany Street, Boston, for the installation, operation and maintenance of a billboard overlooking Interstate-93 (the "I-93 Billboard").  D. 1 ¶¶ 14–15; D. 30 ¶¶ 14–15.  Wrapcity and its owner, Greg John ("John"), applied for the necessary permits and, as alleged in the complaint, financed the acquisition and installation of the I-93 Billboard.  D. 1 ¶ 16; D. 30 ¶ 16.  In 2016, Wrapcity entered into a verbal lease agreement with the owner of a different exterior space located at 22-40 Kneeland Street, Boston, for the installation, operation and maintenance of a static wallscape for outdoor advertising ("Wallscape").  D. 1 ¶ 9; D. 30 ¶ 9.  Wrapcity and John applied for the necessary permits and, as alleged in the complaint, financed the acquisition and installation of the Wallscape.  D. 1 ¶ 10; D 30 ¶ 10.

Wrapcity asserts that it entered into a verbal agreement with Icon, a company owned by DiZazzo, to place advertisements on the I-93 Billboard and the Wallscape.  D. 1 ¶ 23.  Pursuant to this agreement, DiZazzo was responsible for securing advertisements on the billboards but had to obtain Wrapcity's approval for all advertising contracts.  Id. ¶ 24.  In or about May 2013, Icon provided Wrapcity with a proposed one-page agreement between Icon and BIG for the placement of Apple advertising on the I-93 Billboard from June 1, 2013 to December 31, 2013.  Id. ¶¶ 27–

---

[1] The parties have submitted affidavits asserting a range of facts.  D. 33; D. 38.  To the extent these affidavits raise assertions beyond the facts alleged in the pleadings, the Court may not consider them for resolution of the motion for judgment on the pleadings.  See NEPSK, Inc. v. Town of Houlton, 283 F.3d 1, 8 (1st Cir. 2002) (noting that a Rule 12(c) motion "must be based solely on the factual allegations in the complaint and answer").

3

28; D. 30 ¶¶ 27–28.  Wrapcity approved the proposed agreement, as well as the renewal of the contract on an annual basis.  D. 1 ¶¶ 29–30; D. 30 ¶¶ 29–30.

On or about January 1, 2017, and allegedly without Wrapcity's knowledge, DiZazzo entered into a new agreement with BIG concerning the I-93 Billboard ("2017 Agreement").  D. 1 ¶¶ 31–32.  Wrapcity did not notice any changes related to the I-93 Billboard as a result of the 2017 Agreement.  Id. ¶ 33.  Apple continued advertising on the I-93 Billboard, and Wrapcity and John continued receiving the same share of revenue.  Id.

On March 1, 2023, Wrapcity amended its lease agreement with the owner of the property at 363 Albany Street to accommodate the installation of a new digital billboard to replace the I-93 Billboard.  Id. ¶ 17.  Whereas the prior lease agreement had been for a term of twenty years, the amended lease was for a term of ten years commencing on June 15, 2023.  Id.  Defendants were not parties to the amended lease agreement, or the prior lease, and Wrapcity made rent payments under same.  Id. ¶¶ 18, 20; D. 30 ¶¶ 18, 20.  Costs for the conversion of the I-93 Billboard were fronted by Wrapcity, with the exception of a payment by Icon to Wrapcity in April 2023 of $200,000.  D. 1 ¶ 22.

On or about May 1, 2023, Icon entered into an amended agreement with BIG (the "2023 Amendment"), which, as alleged, violated the terms of the amended lease agreement.  Id. ¶¶ 34–35.  As with the 2017 Agreement, Wrapcity claims that Icon did not inform Wrapcity or John of the 2023 Amendment.  Id. ¶¶ 34, 36.  By the spring of 2023, John told DiZazzo that he was negotiating with companies other than BIG for the placement of advertising on the I-93 Billboard, at which point Apple was no longer advertising on same.  Id. ¶¶ 36–37.  As alleged, DiZazzo became agitated and asked John for an opportunity to negotiate an agreement with BIG, without disclosing the 2017 Agreement or the 2023 Amendment.  Id. ¶ 38.  In September 2023, after some

period of negotiation between DiZazzo and BIG, John allegedly told DiZazzo that he would not sign a contract with BIG because another company had offered more favorable terms. Id. ¶¶ 39–40. DiZazzo then told John that he could not agree because he had already committed to a contract with BIG. Id. ¶ 40. In October 2023, DiZazzo authorized BIG to disclose the 2017 Agreement and the 2023 Amendment to Wrapcity and John. Id. ¶ 42. DiZazzo then told John that Wrapcity needed to "play ball" with BIG because, "If BIG loses Boston, they will not pay for my ('Icon's') Park Avenue Board and I can't let that happen." Id. ¶ 43. DiZazzo mentioned that he had a separate arrangement with BIG for a billboard on Park Avenue in New York City and that advertising on the I-93 Billboard and the Park Avenue billboard were "all tied together." Id.

Upon reviewing the 2017 Agreement and the 2023 Amendment, Wrapcity determined that they contained terms that were "unacceptable to Wrapcity and/or in violation of Wrapcity's lease with the LESSOR." Id. ¶ 51. Accordingly, Wrapcity sought to negotiate with BIG for a valid, replacement contract. Id. ¶ 54. Wrapcity alleges that DiZazzo disrupted these negotiations by repeatedly contacting BIG representatives, demanding payment of held-back revenues and holding himself out as a 50% owner of Wrapcity. Id. ¶ 55. On October 23, 2023, Wrapcity served DiZazzo with a cease-and-desist letter demanding that he stop contacting BIG; DiZazzo refused. Id. ¶ 56. After failing to reach an agreement with BIG, Wrapcity contracted with another company for advertising on the I-93 Billboard. Id. ¶¶ 57–58.

**IV.    Procedural History**

On November 7, 2023, Wrapcity instituted this action against Icon, DiZazzo and BIG. D. 1. On January 8, 2024, Icon and DiZazzo filed a third-party complaint against John, D. 34, answered the complaint and asserted counterclaims against John and Wrapcity for breach of contract, breach of fiduciary duty, unjust enrichment, quantum meruit, conversion and tortious

5

interference with contract. D. 30. Icon and Dizazzo now have moved for judgment on the pleadings as to Wrapcity's claims. D. 31. The Court heard the parties on the pending motion on April 17, 2024 and took the matter under advisement. D. 49.

## V. Discussion

### A. Unfair and Deceptive Trade Practices Under Mass. G. L. c. 93A (Count I)

Chapter 93A prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. L. c. 93A, § 2(a). To sustain such a claim, the plaintiff must plausibly allege that (1) the defendant committed an unfair or deceptive act or practice; (2) the unfair or deceptive act or practice occurred in the conduct of any trade or commerce; (3) the plaintiff was injured; and (4) the defendant's unfair or deceptive act or conduct was the cause of the injury. Rafferty v. Merck & Co., Inc., 479 Mass. 141, 161 (2018) (internal citations and quotation marks omitted).

While Chapter 93A does not define what constitutes an "unfair or deceptive" practice, courts have defined "an act or practice [as] unfair if it falls 'within at least the penumbra of some common-law, statutory, or other established concept of unfairness'; 'is immoral, unethical, oppressive, or unscrupulous'; and 'causes substantial injury to consumers.'" Walsh v. TelTech Sys., Inc., 821 F.3d 155, 160 (1st Cir. 2016) (quoting PMP Assocs., Inc. v. Globe Newspaper Co., 366 Mass. 593, 596 (1975)). "[A]n act or practice is deceptive 'if it possesses a tendency to deceive' and 'if it could reasonably be found to have caused a person to act differently from the way he [or she] otherwise would have acted.'" Id. (second alteration in original) (quoting Aspinall v. Philip Morris Cos., Inc., 442 Mass. 381, 394 (2004)). While these definitions do not provide a "precise test for determining whether conduct is unfair or deceptive," Tomasella v. Nestlé USA Inc., 364 F. Supp. 3d 26, 32 (D. Mass. 2019), caselaw makes clear that mere negligence or a simple

breach of contract does not give rise to a Chapter 93A claim.  See, e.g., Anoush Cab, Inc. v. Uber Techs., Inc., 8 F.4th 1, 18 (1st Cir. 2021) (explaining that the caselaw "do[es] not diverge from the Chapter 93A principle that 'something more' [than negligence] and rising to the level of extreme or egregious conduct is required for a successful Chapter 93A claim"); Incase Inc. v. Timex Corp., 488 F.3d 46, 56 (1st Cir. 2007) (explaining that a "[s]imple breach of contract is not sufficiently unfair or deceptive to be alone a violation of Chapter 93A").

"[T]o transform a breach of contract to a Chapter 93A claim, the breach must be both knowing and intended to secure unbargained-for benefits to the detriment of the other party . . . . [T]he theme of the cases in which a breach of contract has amounted to a 93A violation is the use of a breach of contract as a lever to obtain advantage for the party committing the breach in relation to the other party; i.e., the breach of contract has an extortionate quality that gives it the rancid flavor of unfairness."  Whitman & Co., Inc. v. Longview Partners (Guernsey) Ltd., No. 14-cv-12047-ADB, 2015 WL 4467064, at *9 (D. Mass. July 20, 2015) (internal quotation marks and citations omitted).

Icon and DiZazzo argue that Wrapcity's Chapter 93A claim should be dismissed for at least three reasons.  D. 32 at 8–14.  First, they argue that Wrapcity's Chapter 93A claim is premised on a verbal agreement which is "void and unenforceable" under Mass. Gen. L. c. 259, § 7.  D. 32 at 8.  Second, Icon and DiZazzo assert that Wrapcity's Chapter 93A claim fails because Wrapcity and Icon were partners in a joint venture, to which Chapter 93A does not apply.  Id. at 8–13.  Third, Icon and DiZazzo maintain that Wrapcity has not pled its Chapter 93A claim with particularity.  Id. at 13–14.

7

### 1.     *Verbal Agreement Between Icon and Wrapcity*

As alleged, Wrapcity entered into a verbal agreement with Icon to place advertising on the Wallscape and the I-93 Billboard.  D. 1 ¶ 23.  Wrapcity asserts that this agreement required Icon to secure Wrapcity's approval and consent for all advertising on the billboards.  Id. ¶ 24.  Icon and DiZazzo contend that this alleged "verbal agreement" cannot serve as the basis of a Chapter 93A claim because it was void and unenforceable under Mass. Gen. L. c. 259, § 7.  See D. 32 at 7–8.

Mass. Gen. L. c. 259, § 7, provides that "[a]ny agreement to pay compensation for service as a broker or finder . . . shall be void and unenforceable unless such agreement is in writing." "The definitions of 'broker' and 'finder' are well established." Backman v. Smirnov, 751 F. Supp. 2d 304, 311 (D. Mass. 2010).  "A broker is '[a]n agent who acts as an intermediary or negotiator, esp[ecially] between prospective buyers and sellers; a person employed to make bargains and contracts between other persons in matters of trade, commerce, and navigation.'" Cantell v. Hill Holliday Connors Cosmopulos, Inc., 55 Mass. App. Ct. 550, 553 (2002) (alteration in original) (quoting Black's Law Dictionary 187 (7th ed. 1999)).  "A finder is '[a]n intermediary who brings together parties for a business opportunity . . . .  A finder differs from a broker-dealer because the finder merely brings two parties together to make their own contract, while a broker-dealer usu[ally] participates in the negotiations." Id. (alteration in original) (quoting Black's Law Dictionary 646 (7th ed. 1999)).  "A finder locates, introduces, and brings parties to a transaction together, while a broker does more, attempting to bring the parties to an agreement." Id. at 553–54 (citing Shinberg v. Bruk, 875 F.2d 973, 978 (1st Cir. 1989)).

On the allegations in the pleadings, and drawing all reasonable inferences in Wrapcity's favor, Icon and DiZazzo have not conclusively shown that Icon was a broker or a finder.  As an initial matter, there are no allegations in the complaint labeling Icon or DiZazzo as a "broker" or

8

a "finder." See generally D. 1. Icon and DiZazzo instead claim that the allegations regarding the alleged verbal agreement between Wrapcity and Icon suggest that Icon was either a broker or a finder. See D. 32 at 7 (citing D. 1 ¶¶ 11, 28). Under the alleged verbal agreement, Wrapcity authorized Icon to enter into advertising contracts in its own name, but with Wrapcity's approval and consent. See D. 1 ¶¶ 23–24. For instance, Icon entered into the agreements with BIG for Apple advertising, id. ¶¶ 27–40, and, although Wrapcity approved these agreements, it was Icon—not Wrapcity—that ultimately entered into the contracts as a party. See id. ¶ 27 (alleging that "Icon provided Wrapcity with a proposed agreement between Icon Media and a company named Big Media for the placement of Apple advertising on the [I-93] Billboard"). Thus, Icon's alleged role under the verbal agreement was not to introduce Wrapcity and prospective advertisers to one another so that they could make their own contract (as a "finder" would do) or to participate in negotiations aimed at bringing Wrapcity and prospective advertisers to an agreement (as a "broker" would do) but to enter into its own contracts. Cf. Cantell, 55 Mass. App. Ct. at 554 (holding that a recruiting agency operated as a "broker" or a "finder" because it was "willing to negotiate an employment contract between [a prospective employee] and an employer" and because it brought the two "together to form an employment agreement"); Shea v. Millett, 36 F.4th 1, 7 (1st Cir. 2022) (concluding that plaintiff was a broker or a finder where he "help[ed] facilitate a business deal between [defendant] and a third party"). Because Icon did not operate, as presently alleged, as Wrapcity's "broker" or "finder," within the meaning of Mass. Gen. L. c. 259, § 7, the alleged verbal agreement is not void and unenforceable for lack of a writing, and Icon and DiZazzo are not entitled to judgment on the pleadings as to the Chapter 93A claim on this basis.

Moreover, Wrapcity has plausibly alleged facts that go beyond a mere breach of the verbal agreement in support of its Chapter 93A claim. For instance, Wrapcity alleges that "Icon through

9

DiZazzo . . . deceived Wrapcity as to both the existence, the terms, and the implications" of the 2017 Agreement and the 2023 Amendment. D. 1 ¶ 61; see id. ¶ 52 (alleging that "Icon's conduct in entering into the Undisclosed BIG Agreements was deliberate and part of a scheme to deprive Wrapcity of any knowledge or understanding of the terms of the Undisclosed BIG Agreements"). As alleged, Wrapcity would not have consented to the terms of these agreements with BIG, id. ¶ 35, thus highlighting a "rancid flavor of unfairness" toward Wrapcity's contractual interests. See Whitman & Co., Inc., 2015 WL 4467064, at *9 (internal citation and quotation marks omitted). Wrapcity also asserts that Icon and DiZazzo were motivated to mislead Wrapcity about the agreements with BIG to ensure that BIG would not withhold payment for Icon's "Park Avenue Board" in New York City. See id. ¶ 43. At this early stage of the litigation, these allegations are sufficient to support a plausible Chapter 93A claim.

2. *Partners in a Joint Venture*

Icon and DiZazzo also argue that Wrapcity has failed to state a Chapter 93A claim because Wrapcity and Icon were partners in a joint venture. D. 32 at 8–13. "Massachusetts courts have clearly established that transactions between partners in joint ventures are private and not subject to [Chapter] 93A." Ray-Tek Servs., Inc. v. Parker, 64 Mass. App. Ct. 165, 170 (2005); see Thomas & Betts Corp. v. New Albertson's, Inc., No. 10-11947-DPW, 2012 WL 12552275, at *5 (D. Mass. May 29, 2012) (recognizing that "a joint venture is one example of the kind of intra-enterprise dispute exempted from Chapter 93A"), report and recommendation adopted, No. 10-11947-DPW (D. Mass. Aug. 10, 2012), D. 214; Szalla v. Locke, 421 Mass. 448, 451 (1995) (explaining that it is "[i]t is well established that disputes between parties in the same venture do not fall within the scope of [Chapter] 93A, § 11").

10

A joint venture is "a form of business relationship which has not been comprehensively defined by [Massachusetts] courts." Shain Inv. Co. v. Cohen, 15 Mass. App. Ct. 4, 7 (1982). Nonetheless, there is a "pragmatic check list" of factors which "may bear upon the recognition of" a joint venture, including "(1) an agreement by the parties manifesting their intention to associate for joint profit not amounting to a partnership or a corporation; (2) a contribution of money, property, effort, knowledge, skill, or other assets to a common undertaking; (3) a joint property interest in all or parts of the subject matter of the venture; (4) a right to participate in the control or management of the enterprise; (5) an expectation of profit; (6) a right to share in profits; (7) an express or implied duty to share in losses; and (8) a limitation to a single undertaking (or possibly a small number of enterprises)." Thomas & Betts Corp., 2012 WL 12552275, at *5 n.8 (quoting Shain Inv. Co., 15 Mass. App. Ct. at 8–9).

The parties dispute many of the facts bearing upon the existence of a joint venture here. Although there seems to be some indication that the parties intended to associate for joint profit, see, e.g., D. 1 ¶ 11 (alleging that Wrapcity agreed to accept 50% payment from the monthly net advertising revenues that Icon collected from the Wallscape); D. 30 ¶ 11 (admitting same), the parties do not agree upon their respective contributions of money, property, effort, knowledge, skill or other assets with respect to advertising on the Wallscape and the I-93 Billboard. See, e.g., id. ¶ 10 (Wrapcity alleging that Icon and DiZazzo did not make financial contributions to the construction or expenses of the Wallscape); D. 30 ¶ 10 (Icon and DiZazzo denying same). The parties also dispute the nature of their rent obligations under the relevant lease agreements. See, e.g., D. 1 ¶ 20 (Wrapcity alleging that it was the sole entity responsible for payment of monthly rent for the I-93 Billboard); D. 30 ¶ 20 (Icon and DiZazzo denying same and asserting that Icon and Wrapcity were "equally responsible for payment of rent to the owner of the building").

The parties also disagree over their respective rights to "to participate in the control or management" of advertising on the Wallscape and the I-93 Billboard. See Shain Inv. Co., 15 Mass. App. Ct. at 9. Wrapcity alleges that the parties verbally agreed that Icon had to obtain Wrapcity's approval and consent for any contracts for advertising on the billboards, D. 1 ¶ 24; Icon and DiZazzo deny same. D. 30 ¶ 24. As to the remaining factors, the pleadings offer little clarity as to whether the parties had a duty to share in losses but do suggest that business dealings between Icon and DiZazzo and Wrapcity were limited to advertising on the Wallscape and the I-93 Billboard. Nonetheless, given the factual disputes concerning the parties' financial contributions to the billboards and their respective rights to control advertising on same (disputes which must be construed, at this juncture, "in the light most flattering" to Wrapcity), Icon and DiZazzo have not "conclusively establish[ed]" that Wrapcity and Icon were partners in a joint venture.[2] See Aponte-Torres, 445 F.3d at 54.

Icon and DiZazzo also appear to argue that, assuming *arguendo* Wrapcity and Icon were not partners in a joint venture, Chapter 93A still does not apply because, as alleged, Icon owed a fiduciary duty to Wrapcity. D. 32 at 13 (citing cases including, for one example, In re Curran, 157 B.R. 500, 508 (D. Mass. 1993)). Given that the relationship between the entities is disputed, as discussed above, the nature of any duty can also not be conclusively settled at this stage and,

---

[2] To the extent Icon and DiZazzo argue that a partnership existed regardless of whether Wrapcity and Icon were involved in a joint venture, see D. 32 at 9–11, in light of the parties' disputes over their respective control over advertising on the billboards, see, e.g., D. 1 ¶ 24; D. 30 ¶ 24, as well as the lack of clarity as to how Icon and Wrapcity shared losses, the Court cannot conclude that Icon and DiZazzo have "conclusively establish[ed]" that a partnership existed. See Aponte-Torres, 445 F.3d at 54; see also Kansallis Fin. Ltd. v. Fern, 40 F.3d 476, 478–79 (1st Cir. 1994) (noting that Massachusetts courts determine whether a partnership exists by considering three factors, among them the sharing by the parties of profits and losses and the participation by the parties in the control or management of the enterprise).

therefore, the Court cannot conclude that there is any fiduciary duty between the parties that would otherwise bar a Chapter 93A claim.

It is true that disputes among partners in a joint venture are not the only types of disputes exempted from Chapter 93A's sweep. See Thomas & Betts Corp., 2012 WL 12552275, at *5. The relevant inquiry, however, is whether the verbal agreement between Wrapcity and Icon "constitutes a commercial transaction between a person engaged in trade or commerce and another person engaged in trade or commerce, so that they were acting in a business context subject to Chapter 93A." Id. Here, the complaint sufficiently alleges that Wrapcity and Icon were "discrete, independent business entities," and Icon and DiZazzo have not conclusively established otherwise. See In re Curran, 157 B.R. at 508; see, e.g., D. 1 ¶¶ 1–2 (alleging that Wrapcity and Icon were different companies incorporated in different states); id ¶¶ 9–10, 14–15 (alleging that Wrapcity independently leased the properties where the Wallscape and the I-93 Billboard were located). In addition, the Court's analysis of the joint venture factors, while not dispositive of the question whether Wrapcity and Icon were independent business entities, further supports denial of Icon and DiZazzo's motion for judgment on the pleadings. See Thomas & Betts Corp., 2012 WL 12552275, at *5 (noting that the joint venture factors "may be instructive" in determining whether an agreement resembles an intra-business dispute exempt from Chapter 93A).

### 3. Pleading with Particularity

Icon and DiZazzo further contend that Wrapcity failed to plead its Chapter 93A claim with particularity under Fed. R. Civ. P. 9(b). D. 32 at 13–14. Wrapcity does not deny that its Chapter 93A claim must be pled with particularity but instead asserts that the allegations in the complaint satisfy Rule 9(b). D. 37 at 8–9.

13

The Rule 9(b) heightened pleading standard applies to claims under Chapter 93A that involve fraud. See Mulder v. Kohl's Dep't Stores, Inc., 865 F.3d 17, 21–22 (1st Cir. 2017). Rule 9(b) provides that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Dumont v. Reily Foods Co., 934 F.3d 35, 38 (1st Cir. 2019) (quoting Rule 9(b)). The First Circuit has explained that "[t]he circumstances to be stated with particularity under Rule 9(b) generally consist of 'the who, what, where, and when of the allegedly [misleading] representation.'" Kaufman v. CVS Caremark Corp., 836 F.3d 88, 91 (1st Cir. 2016) (alteration in original) (quoting Alt. Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 29 (1st Cir. 2004)). The purpose of Rule 9(b) is "to place the defendants on notice and enable them to prepare meaningful responses," "to preclude the use of a groundless fraud claim as a pretext to discovering a wrong," and "to safeguard defendants from frivolous charges which might damage their reputation." New Eng. Data Servs., Inc. v. Becher, 829 F.2d 286, 289 (1st Cir. 1987).

Here, Wrapcity has alleged its Chapter 93A claim with particularity. Wrapcity alleges that Icon and DiZazzo (the "who") deceived Wrapcity through the nondisclosure of Icon's agreements with BIG, i.e., the 2017 Agreement and the 2023 Amendment (the "what")—which, as alleged, Wrapcity did not authorize and which violated Wrapcity's lease agreement for the I-93 Billboard. D. 1 ¶¶ 60–61. To the extent omissions can be anchored to a location, they generally concerned the I-93 Billboard, which Wrapcity alleges is located at 363 Albany Street, Boston, MA (the "where"). See id. ¶ 14. The complaint also includes specific allegations of "when" Icon and DiZazzo entered into the 2017 Agreement and the 2023 Amendment—the former "[o]n or about January 1, 2017," id. ¶ 31, and the latter "[o]n or about May 1, 2023." Id. ¶ 34.

The allegations in the complaint adequately place Icon and DiZazzo on notice of the alleged fraud. See New Eng. Data Servs., Inc., 829 F.2d at 289. For instance, Wrapcity alleges that the

14

undisclosed agreements contained "numerous misrepresentations of material fact . . . including . . . claims that Icon had a lease, license or other agreement with the Lessor/Owner of the building at 323 Albany Street, Boston, MA to operate an outdoor advertising location." D. 1 ¶ 45.  Wrapcity further asserts that Icon and DiZazzo's failure to disclose the agreements was material because they "contain[ed] numerous provisions that [were] unacceptable to Wrapcity." Id. ¶ 51.  The complaint alleges that it was not until late September 2023 that DiZazzo finally disclosed the existence of the agreements and that, even then, DiZazzo's disclosures "were evasive and incomplete." Id. ¶ 42.  Wrapcity also identified a motive for DiZazzo to have concealed the information from Wrapcity, i.e., that the undisclosed agreements provided Icon and DiZazzo with leverage with respect to advertising on the Park Avenue billboard in New York City. Id. ¶ 43.  Because these allegations are sufficient to place Icon and DiZazzo on notice of the alleged fraud and to enable them to prepare a meaningful response, the Court declines to dismiss Wrapcity's complaint under Rule 9(b).

### B.   Declaratory Judgment, Breach of Contract and Unjust Enrichment (Counts II–IV)

Icon and DiZazzo argue that Wrapcity's declaratory judgment, breach of contract and unjust enrichment claims (Counts II–IV) should all be dismissed because the alleged verbal agreement between Wrapcity and Icon, which required Icon to obtain Wrapcity's approval before entering into advertising contracts, is "void and unenforceable" under Mass. Gen. L. c. 259, § 7. D. 32 at 6–7, 14–15.  As the Court already noted in its analysis above, however, § 7 does not render the verbal agreement void and unenforceable because, drawing all reasonable inferences in Wrapcity's favor, the uncontested facts do not conclusively establish that Icon acted as a broker or a finder on behalf of Wrapcity.  Accordingly, the Court denies Icon and DiZazzo's motion for judgment on the pleadings as to Counts II, III and IV.

### C. Tortious Interference with Advantageous Business Relations (Count V)

Finally, Icon and DiZazzo argue that Wrapcity has failed to state a claim of tortious interference with advantageous business relations. D. 32 at 15–19. To show tortious interference with advantageous business relations, the plaintiff must prove "(1) a business relationship or contemplated contract of economic benefit; (2) the defendant's knowledge of such relationship; (3) the defendant's interference with it through improper motive or means; and (4) the plaintiff's loss of advantage directly resulting from the defendant's conduct." Am. Private Line Servs., Inc. v. E. Microwave, Inc., 980 F.2d 33, 36 (1st Cir. 1992) (citing United Truck Leasing Corp. v. Geltman, 406 Mass. 811 (1990)).

With respect to the first element, a business relationship, the complaint alleges that, from June 2016 to June 2023, Wrapcity had an advantageous business relationship with BIG for the placement of advertising on the I-93 Billboard. D. 1 ¶ 85; see id. ¶ 33 (alleging that Wrapcity received revenue as part of Apple's advertising on the I-93 Billboard); see also Conformis, Inc. v. Aetna, Inc., 58 F.4th 517, 539 (1st Cir. 2023) (holding that, at the motion to dismiss stage, a plaintiff need only make a "modest showing" of advantageous relations). The complaint also plausibly alleges that Icon and DiZazzo knew that the BIG relationship conferred some advantage upon Wrapcity, particularly given the allegations that Icon would send Wrapcity a share of revenue generated by the I-93 Billboard. See D. 1 ¶ 33; Conformis, Inc., 58 F.4th at 539–40. As to the third element, interference, Wrapcity sufficiently alleges that Icon and DiZazzo interfered with its relationship with BIG by agreeing to the 2017 Agreement and the 2023 Amendment without Wrapcity's approval and then misrepresenting the relationship between Icon and Wrapcity to BIG as Wrapcity sought to salvage a business relationship with BIG. See id. ¶¶ 31–58; United Truck Leasing Corp., 406 Mass. at 817.

16

As to the fourth element of Wrapcity's tortious interference claim, i.e., "the plaintiff's loss of advantage directly resulting from the defendant's conduct," Am. Private Line Servs., Inc., 980 F.2d at 36, the complaint alleges that Wrapcity "has suffered severe and continuing financial harm and loss" as a direct result of Icon and DiZazzo's conduct. D. 1 ¶ 90. Drawing all reasonable inferences in Wrapcity's favor, and declining to resolve factual disputes at this early juncture in the litigation, it is at least plausible that Icon and DiZazzo's alleged misrepresentations to BIG (via the 2017 Agreement and the 2023 Amendment), see, e.g., id. ¶¶ 25, 45, as well as DiZazzo's subsequent interruption of negotiations between Wrapcity and BIG, id. ¶¶ 55–56, caused financial harm to Wrapcity. See Conformis, Inc., 58 F.4th at 539 (characterizing the fourth element of a tortious interference with advantageous relations claim as whether "the plaintiff was harmed by the defendant's actions") (citation omitted). Accordingly, the Court concludes that Wrapcity has plausibly alleged its tortious interference with advantageous business relations claim and that Icon and DiZazzo are not entitled to judgment on the pleadings on Count V.

## VI. Conclusion

For the foregoing reasons, Defendants' motion for judgment on the pleadings is DENIED. D. 31.

**So Ordered.**

/s Denise J. Casper
United States District Judge